UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENISE D. CROCCO, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:04cv1608(JCH) |
| ADVANCE STORES CO. INC. et. al., | : | |
| Defendants. | : | |
| | : | MARCH 15, 2006 |

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**[Doc. Nos. 37, 38, & 41]**

I.   **INTRODUCTION**

The plaintiff, Denise D. Crocco ("Crocco"), asserts claims against her former

employer, Advance Stores Co. Inc. ("Advance"); her former supervisor at Advance,

David Logue ("Logue"); another Advance employee, Joseph S. Glorioso ("Glorioso");

the City of Waterbury; and Waterbury police officer Daniel C. Stanton ("Stanton").

Crocco asserts claims against Advance for "Discriminatory Terms, Conditions, and

Privileges of Employment" in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the

Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60(a)(1),

(Count I), and for retaliation for conduct protected under Title VII and the CFEPA

(Count II).  She also asserts claims for malicious prosecution (Count III) against

Advance, Logue, and Glorioso.  She further claims that Logue and Glorioso are liable

for intentional infliction of emotional distress (Count VI) and Advance for negligent

infliction of emotional distress (Count VII).  Finally, she asserts claims pursuant to 42

U.S.C. § 1983, for false arrest and unreasonable search and seizure, against Stanton

(Count IV) and the City of Waterbury (Count V).  All of the defendants have moved for

1

summary judgment on all of the claims against them.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden lies on the moving party to
establish that there are no genuine issues of material fact in dispute and that it is
entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360
F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing –
that is pointing out to the district court – that there is an absence of evidence to support
the nonmoving party's case."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d
Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord
Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with affidavits, if any, show that there is
no genuine issue as to any material fact . . . ."  Miner v. City of Glens Falls, 999 F.2d
655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted).  A dispute
regarding a material fact is genuine "'if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963
F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506
U.S. 965 (1992).  After discovery, if the nonmoving party "has failed to make a sufficient
showing on an essential element of [its] case with respect to which [it] has the burden of
proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the

2

nonmoving party in order to determine how a reasonable jury would decide." <u>Aldrich</u>, 963 F.2d at 523 (internal citation omitted).  Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" <u>Id</u>. (quoting <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991), <u>cert. denied</u>, 502 U.S. 849 (1991)); <u>see also</u> <u>Suburban Propane v. Proctor Gas, Inc.</u>, 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is inappropriate.").  "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  <u>Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  <u>Id</u>.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir.1990) (internal quotations

3

and citations omitted).  Similarly, a party may not rely on conclusory statements or an

argument that the affidavits in support of the motion for summary judgment are not

credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## III.   FACTS[1]

### A.   Employment and Resignation

Advance hired Crocco in July 2000 as an Assistant Store Manager.  She

performed well, received positive feedback, and in November 2001 was promoted to be

the manager of Store No. 6241 on Wolcott Street in Waterbury, Connecticut.  As

Crocco's direct supervisor, Logue evaluated her performance as Store Manager.  In the

August 2002 performance review following her promotion, he told Crocco she was not

meeting expectations with regard to store profit, while also making encouraging

comments.  See Exempt Performance Appraisal, Aug. 3, 2002, Advance's & Glorioso's

Mem. Supp. Mot. Summ. J., Ex. E [Doc. No. 44].  Crocco found this evaluation to be

fair.  Crocco Dep. at 220-21, Advance's & Glorioso's Mem. Supp. Summ. J., Ex. A [Doc.

No. 44].  In a November 2002 performance review, Plaintiff was told she was ahead of

her sales goal, but again was not meeting expectations with regard to store profit, and

also received a supportive comment.  See  Exempt Performance Appraisal, Nov. 3,

2002, Advance's & Glorioso's Mem. Supp. Mot. Summ. J., Ex. F [Doc. No. 44]; Crocco

Dep. at 221-23, Advance's & Glorioso's Mem. Supp. Summ. J., Ex. A [Doc. No.

44].  Crocco's April 2003 performance evaluation called for improvement in several

---

[1]For purposes of the instant motions, the court accepts as true facts undisputed between Crocco and any moving party to whose motion such facts are material.  It resolves factual disputes by drawing all inferences that the evidence can reasonably support in favor of Crocco, the nonmovant.

areas and again criticized Crocco's ability to operate profitably, while praising her success in the commercial program and sales.   Performance Management Worksheet, Apr. 1, 2003, Advance's & Glorioso's Mem. Supp. Mot. Summ. J., Ex. G [Doc. No. 44]; Crocco Dep. at 223-25, Def.'s Ex. A.  Crocco has testified that she did not think this evaluation "was all the way fair," but has also testified she did not actually "disagree" with it.  On Crocco's request, Logue replaced her assistant store manager, Lou Federico, with another assistant store manager, Bill LeMay.  Crocco complained that LeMay did not do a good job, and wanted Federico to be returned to the position.  In August 2003, Logue and Glorioso evaluated the store that Crocco managed, giving it an overall rating of 29% out of 100%.  DM Store Evaluation, Aug. 24, 2003 Advance's & Glorioso's Mem Supp. Mot. Summ. J., Ex. I [Doc. no. 44].   The profit and loss review indicated below-budget retail sales, over-budget payroll, and below-budget net operating income, id.  However, it did not take into account commercial sales.  Crocco Aff. ¶ 146 [Doc. No. 55].  Following this review, Logue and Crocco had a discussion in which Logue told Crocco that they needed to try to find a way to turn her store around and told her that one option he was considering was to replace her as store manager and have her expand and run the commercial delivery truck business as an operation separate from the store, at a pay rate slightly less than her current rate as store manager.  Plf.'s Loc.R. 56(a)2 Statement Re:  Logue ¶ 15 [Doc. No. 58].

Between November, 2001, and the early months of 2003, Logue made sexual comments, advances, and references to sexual acts during various discussions with Crocco.  Crocco Aff. ¶ 133 [Doc. No. 55].  He put his arm around her and touched her breast at a business meeting in late 2002 or early 2003.  Id. at ¶ 134.  At an Advance

Christmas party and at quarterly meetings and conventions, Logue drank alcohol and touched women inappropriately.  Id. at ¶ 135, 138; see Rodriguez Aff., Plf.'s Mem. Opp. Mots. Summ. J., Ex. 26 [Doc. No. 62] (stating that Logue kissed and groped two women at the Christmas party and had to be pulled off them by Glorioso).  At least one of the women whom Crocco attacked in this manner was an Advance employee.  Crocco Aff. at  ¶ 135; Rodriguez Aff.   Crocco also testified to having witnessed Logue engaging in "inappropriate sexual behavior" with other female Advance employees, Crocco Aff. at ¶ 137, and alleges that he had sexual relationships with two particular female employees, id. at ¶¶ 20-22.  Logue invited Crocco out to lunch and to engage in social activities outside of work.  Id. at ¶ 134, 139; Crocco Dep. at 105-07, Advance's & Glorioso's Mem. Supp. Mot. Summ. J., Ex. A [Doc. No. 44]; see also Email from Logue to Crocco, Aug. 29, 2003, Advance's & Glorioso's Mem. Supp. Mot. Summ. J., Ex. J [Doc. No. 44].

     In the summer of 2003, following the August store evaluation, Logue began visiting Crocco's store more frequently.  Crocco claims that, beginning in summer 2003, Logue evaluated her unfairly, visiting on rainy days and delivery days.  Crocco Aff. ¶¶ 32,  34, 145.   She has stated that Logue ignored the same type of issues he criticized in her store when they occurred in other stores run by his male friends, Crocco Aff. ¶ 148 [Doc. No. 55].  She claims that Logue wanted to demote her in order to give her store manager position to Amber Perdrizet, a woman with whom he was sexually involved.  Id. at ¶ 19-21.  From August 2003 to the time she left Advance, Logue sent her harassing emails, containing "nasty comments" and stating that he was going to take her out of the store and place Perdrizet in the store.  Id. at ¶¶ 151-52.  Perdrizet was assigned to Crocco's Store Manager position shortly after Crocco left Advance.

6

See Logue Dep. at 80, Advance's & Glorioso's Mem. Supp. Mot. Summ. J., Ex. F [Doc. No. 44]; see also Gordy Aff., Plf.'s Mem. Opp. Mots. Summ. J., Ex. 31 (alleging that "all female employees who took part in the fraternization with Dave [Logue] were given more opportunity to advance in the company than others") [Doc. No. 62].

Crocco has attested that she left several messages with the secretary of Logue's supervisor to complain that Logue was sexually harassing her, but that she stopped making calls after Logue asked her why she was calling his supervisor.  Crocco Aff. ¶ 141-42.  Advance had a sexual harassment policy, and Crocco had taken and passed its Sexual Harassment on-line course in 2001.  She knew that Advance had a hotline to report sexual harassment complaints but did not call it.  Crocco did not call because she knew that another woman who had called a hotline and revealed that she had AIDS was fired for having this disease.  Id. at ¶ 143-144.

On August 29, 2003, Logue sent an email to Crocco, copied to Glorioso, to arrange "a serious talk outside of [her] store"[2] because the store she was managing was underperforming.  Email from Logue to Crocco at 1, Advance's & Glorioso's Mem.

_____

[2]Advance and Glorioso state that this meeting was arranged for September 4, Advance's and Glorioso's Local Rule 56a1 Statement at ¶ 24 [Doc. No. 59].  Crocco's Rule 56(a)2 statements in response to Advance's and Glorioso's motion for summary judgment and Logue's motion for summary judgment states that the meeting was scheduled for September 5, although it does not cite to any evidence that supports this statement.  See Plf.'s Loc.R. 56(a)2 Statement Re:  Advance & Glorioso at ¶  24 [Doc. No. 59]; Plf.'s Loc.R. 56(a)2 Statement Re: Logue at ¶ 16  [Doc. No. 58] (citing Crocco Aff. at ¶ 36 [Doc. No. 55] ("I was never informed about any meeting scheduled for , [sic] 2003, until I received documents from Advance following my claim to the Commission on Human Rights and Opportunities and this lawsuit.")).  However, the dispute over the date is not material to this ruling.
It should be noted that the Rule 56(a)2 statement that Crocco filed responding to Logue's Rule 56(a)1 statement is erroneously titled "Plaintiff's Local Rule 56(a)2 Statement Re:  Defendants City of Waterbury and Daniel C. Stanton."

Supp. Mot. Summ. J., Ex. J [Doc. No. 44].  He stated that she would not be able to handle the expansion he envisioned for the store, although she "would be great" running a different program.  Id.

On September 3, 2003,[3] Crocco notified Logue and her Assistant Manager in Training, Thomas Houghtaling, that she was quitting her job.   Crocco Aff. ¶ 16-18, 24. She did not thereafter return to the store she had managed.  Id.  On September 5, Crocco spoke to Al Overend, an Advance Risk Services Department manager.  She told him that she was not going to sleep with anyone to keep her job or to advance in her job.  Id. at ¶ 39.

### B.    Arrest, Search, and Prosecution

On the morning of September 5, Crocco drove to a Barnes & Noble store in Waterbury to attend a job interview with another company.  She arrived one half-hour early, at 10:30 a.m., and sat in her truck in the parking lot of the Barnes & Noble store, eating breakfast and waiting for the arrival of her interviewer.   Id. at ¶¶ 58, 60.

Meanwhile, Logue and Glorioso, who were having coffee in the Barnes & Noble, noticed Crocco sitting in her truck.  They called Overend and asked what they should do.  At the time they called, Logue was aware that there had previously been a shooting at Advance, Logue Dep. at 57, Logue's Loc.R. 56(a)1 Statement, Appx. [Doc. No. 38-

---

[3]There is some evidence that another evaluation of Crocco's store was performed on September 3, 2003, see DM Store Evaluation, Sept. 3, 2003, Advance's and Glorioso's Mem. Supp. Mot. Summ. J., Ex. L [Doc. No. 44].  Crocco disputes that this evaluation was actually performed, based upon the fact that the form lacks a signature by a division manager, but does not present any evidence suggesting it was not performed. For purposes of the present motions, the court does not rely on any of the conclusions in the September 3 evaluation form, but those conclusions would not materially change the court's ruling.

4]; Plf.'s Loc.R. 56(a)2 Statement Re: Logue at ¶ 37 [Doc. No. 58].  Overend asked if

Crocco had guns, and they told him that they thought her husband hunted and

assumed she had access to guns.  Plf.'s Loc.R. 56(a)2 Statement Re: Advance &

Glorioso at ¶ 54.  Crocco has attested that neither she nor her husband has ever

hunted and that they do not own any guns.  Crocco Aff. ¶¶ 12-14.  Overend advised

Logue and Glorioso to call the police, which they did.   According to the report later

prepared by Officer Stanton, who was dispatched to the scene, Logue told him upon his

arrival:  (1) that Crocco had followed Logue's and Glorioso's vehicle from the Advance

store on Wolcott Street to the Barnes & Noble store and was parked in her white pick-

up truck in the parking lot; (2) that she had not shown up for work for two days and that

Logue believed this was because she was going to be investigated for stealing; (3)

[t]hat she had been doing odd things around the office the past few weeks; and (4) that

Logue was scared as to what Crocco might do because she appeared unstable, leading

him and Glorioso to run into the Barnes & Noble store to get away from her.  Incident

and Offense Report ("IOR"), Logue's Loc.R. 56(a)1 Statement, Ex. J [Doc. No. 38-4].

Logue admits that the statements that Crocco followed him and Glorioso from the

Advance Store to the Barnes & Noble store, as well as statements (2) and (4) above,

were materially false, Logue's Loc.R. 56(a)1 Statement at ¶ 44, and that statement (3)

must be treated as materially false for purposes of the present motions, Logue's Mem.

Supp. Mot. Summ. J. at 12 [Doc. No. 38].  There is evidence that Glorioso also told

Stanton that he was scared as to what Crocco might do because she appeared to be

unstable, so he and Logue ran to the Barnes & Noble store to get away from her.  IOR,

Logue's Loc.R. 56(a)1 Statement, Ex. J [Doc. No. 38-4], and there is no evidence that

he corrected any of Logue's false statements.  Based on Logue's and Glorioso's statements, Stanton thought the incident being reported might involve stalking and decided to look into it.  Plf.'s Loc.R. 56(a)2 Statement Re: Logue ¶ 47 [Doc. No. 58]; Stanton Dep. 16-17, Logue's Mem. Supp. Mot. Summ. J. Appx. [Doc. No. 38-4]; see also id. at 60-61 (stating that Logue's and Glorioso's report that Crocco had followed them from the Advance store to the Barnes & Noble store "had something to do with" his decision to perform a motor vehicle stop).

While she was sitting in her pick-up truck, Crocco saw Logue and Glorioso come out of the Barnes & Noble store.  Id. at ¶ 60.  She pulled out of the parking lot to avoid them, although she planned to circle around and return to the parking lot after their departure.  Id. at 61. Just as she pulled onto the street, she was stopped by Stanton. Id. at ¶¶ 62-64.   She did not immediately realize that his lights and siren were directed at her, but did pull over when he pulled his police car behind her truck.  Id. at 62, 64. Officer Stanton explained to Crocco why he had stopped her.  When he asked her what she was doing, she told him that she was waiting for an 11:00 a.m. interview at the Barnes & Noble store.  Crocco Aff. ¶¶ 65-66.  Stanton immediately began swearing at her.  Yelling and using profanity, he told her to stop lying and asked where her gun was. Id. at ¶¶ 67-68; Plf.'s Loc.R. 56(a)2 Statement Re:  Logue ¶ 55 [Doc. No. 58].  Crocco denied having a gun.  Id. at ¶ 69.   He also told her he knew she was under investigation for stealing.  Id.  Crocco told Stanton that she had pulled out of the parking lot because she saw her former managers and did not want to have any contact with them and that she did not see Stanton or his car before she pulled out of the parking lot.  Id. ¶ 71.

10

At that point, Stanton took Crocco's license and registration, while she stayed in the truck.  When he returned, he told Crocco that she had been to the Wolcott Street store that morning, threatening and stalking Logue and Glorioso with a gun since 7:30 that morning.  Plf.'s Rule 56(a)2 Statement Re: Logue ¶ 61 [Doc. No. 58]; Crocco Dep. 37-38.  She told him that he was crazy, that Logue and Glorioso were lying, and that if he went into Barnes & Noble and found Kevin Bouldin, the person who was supposed to be interviewing her, they could clear up everything.  Plf.'s Loc.R. 56(a)2 Statement Re: City and Stanton at ¶ 19; Crocco Aff. ¶ 74.  She told him that she had dropped her children off at school that morning and then went to get gas, and that she could prove she had not been at 625 Wolcott Street that morning.   Crocco Aff. ¶¶ 75-76.  She told him that he should speak to Bouldin, and he kept telling her that she was lying and that she should "shut up."  Id. at ¶ 77.  She further told Stanton that neither she nor her husband owned a gun, used guns, or had them in the house.  Id. at ¶ 78.  She did not raise or swing her arms while talking, and did not raise her voice.  Id. at ¶ 80.

Stanton removed Crocco from her truck, walked her to the back of his police car and left her there with a second Waterbury police officer.  She tried to call Bouldin on her cell phone so that Stanton could confirm that she was telling the truth about her meeting.  Id. at ¶ 82; Phone Invoice, Denise Crocco, Plf.'s Mem. Opp. Summ. J., Ex. 1 [Doc. No. 62].  She then tried to call Sterbank, Logue's and Glorioso's supervisor at Advance, but Stanton stopped her by telling her to hang up the phone, again using profane language.  Crocco Aff. ¶ 83.  Crocco told Stanton that Sterbank could help.  Id. at ¶ 84.

Stanton made a warrantless arrest of Crocco on the charge of breach of the

11

peace in the second degree.  Plf.'s Loc.R. 56(a)2 Statement Re: Logue ¶ 69 [Doc. No. 58]; <u>see</u> IOR, Logue's Loc.R. 56(a)1 Statement, Ex. J [Doc. No. 38-4]; Conn. Gen. Stat. § 53a-181(a).  Logue and Glorioso had parked their car behind Stanton's police car, and Stanton patted down Crocco's body while Logue and Glorioso were watching.  <u>Id.</u> at ¶¶ 86-88.   He also handcuffed Crocco.  <u>Id.</u> at ¶ 85.  He then left her with the second police officer.  <u>Id.</u> at ¶ 85.  The second officer had parked his police car in front of Crocco's truck.  <u>Id.</u> at ¶¶ 94-95.  The second officer asked Stanton why he was not checking out Crocco's story, said he did not want any part of Crocco's arrest, and left when Stanton told him to shut up.  <u>Id.</u> at ¶¶ 99-101.

Stanton placed Crocco in his police car.  <u>Id.</u> at 100.  He searched Crocco's truck and took some documents from its front seat.  <u>Id.</u> at ¶ 103-04; Glorioso Dep. at 86, Plf.'s Mem. Opp. Mots. Summ. J., Ex. 7 [Doc. No. 62]; Logue Dep. at 73, Plf.'s Mem. Ex. 8.  He gave the documents to Logue and Glorioso.  <u>Id.</u>  He asked Crocco where her keys to the Advance store were.  She told him they were on her key ring, and when she later got her truck back her store key was not on the ring.  <u>Id.</u> at ¶¶ 105-06.

While Crocco was sitting, handcuffed, in Stanton's police car, Logue and Glorioso pulled away in their car and were laughing as they passed the police car.  <u>Id.</u> at ¶ 107.  Crocco then told Stanton that she was "going to get those guys for what they had done and make them pay."  <u>Id.</u> at ¶ 108; <u>see</u> IOR, Logue's Loc.R. 56(a)1 Statement, Ex. J [Doc. No. 38-4].

Stanton then drove Crocco to a police station.  During this drive, she told him she was hyperventilating, and he told her to "shut-up."  <u>Id.</u> at ¶ 112.  She told him her asthma inhaler was in her truck.  <u>Id.</u>  At the station, a female officer searched her.  <u>Id.</u> at

¶¶ 109-10.  She was booked and released on a promise to appear.  Plf.'s Loc.R. 56(a)2 Statement Re:  Logue ¶ 70 [Doc. No. 58].

Stanton advised Logue and Glorioso to obtain a protective order against Crocco . Plf.'s Loc.R. 56(a)2 Statement Re:  Advance and Glorioso ¶ 63 [Doc. No. 59].

Following her arrest, Crocco appeared in court and was told that she was under investigation for stealing.  Crocco Aff. at ¶¶ 113-14.  She was never charged with anything other than the original charge of breach of the peace in the second degree. Approximately five and one-half months later, the charges against her were dismissed. Id. at ¶¶ 113-17.

## IV.    DISCUSSION

### A.    Title VII and CFEPA

Counts I and II state claims against Advance for "Discriminatory Terms, Conditions, and Privileges of Employment" and retaliation, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60(a)(1).  The case law interpreting Title VII also guides the interpretation of CFEPA.  Brittell v. Dep't of Correction, 717 A.2d 1254, 1264 (Conn. 1998).  Therefore, the court considers claims under both laws together.

### 1.    Sexual Harassment and Hostile Work Environment

In Count I, Crocco claims that Logue sexually harassed her, discriminated against her by threatening to demote her because she would not respond to his advances, and generally created "intolerable working conditions" for her.  She alleges generally that Logue acted with the intent of forcing her to quit, and that her resignation was a reasonably foreseeable result of his actions.

13

To establish a "hostile work environment" claim, a plaintiff must show that "(1) the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (citing Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)). Advance argues that Crocco's claim fails to meet either of these requirements. It argues first that Advance exercised reasonable care to prevent sexual harassment and Crocco never complained to anyone that she was being sexually harassed. In the alternative, it argues that the plaintiff's allegations, even if true, do not suggest acts of harassment sufficiently serious to support Title VII liability. Advance's & Glorioso's Mem. Supp. Mot. Summ. J. at 11-12 [Doc. No. 42] [hereinafter Advances' & Glorioso's Mem. Supp.]. The court begins by considering whether Advance may be held vicariously liable for Logue's actions, assuming for the purposes of this discussion that they could have created a hostile work environment or otherwise constitute sexual harassment. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 n.8 (holding that this order of analysis is permissible, though not required).

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the United States Supreme Court established an affirmative defense for employers facing claims of vicarious liability for hostile work environments created by supervisory employees. This affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Faragher, 524 U.S.

14

at 808.  "A tangible employment action constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Jin v. Metropolitan Life Ins. Co., 310 F.3d 84, 93 (2d Cir. 2002) (quoting Burlington,, 524 U.S. at 761). The present record contains no evidence that Logue's harassment of Crocco culminated in such a tangible employment action.  Even assuming that Crocco's decision to quit was caused by the hostile work environment that Logue created or by his direct sexual harassment of her, a resignation does not amount to a tangible employment action as the Supreme Court has used that term.  See Burlington, 524 U.S. at 748, 766 (holding that plaintiff had not alleged a tangible employment action even though she alleged that she resigned her job as a result of sexual harassment by a supervisor); Faragher, 524 U.S. at 780, 808 (holding, where plaintiff had resigned from her job after enduring a hostile work environment, that the employing City could raise the affirmative defense).  Logue's unfulfilled threat to demote Crocco does not constitute a tangible employment action.  The Second Circuit has specifically noted, albeit in dicta, that a male supervisor's threat to demote a female employee should she refuse to submit to his sexual demands does not constitute a tangible employment action "if she initially resisted and he did not follow through with his threat of termination." Jin, 310 F.3d at 97.  Crocco never submitted to any demands that might be inferred from the evidence of Logue's conduct.

Therefore, the court considers whether, drawing all reasonable inferences in Crocco's favor, the evidence in the record would establish the required elements of the Burlington/Faragher affirmative defense, or whether genuine issues of material fact

remain as to this defense.   To prove this affirmative defense, Advance must establish:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

Burlington, 524 U.S. at 765; Faragher, 524 U.S. at 778.

As both parties agree, Advance had a sexual harassment policy, an online sexual harassment training course, and a hotline that employees could call to report sexual harassment.  Crocco had taken the online course in 2001, and knew about the hotline during her employment.  Moreover, although Crocco provides some evidence that Logue sexually harassed other women at an Advance Christmas party and an unspecified number of business conventions and quarterly meetings, she proffers no evidence that anyone at Advance with responsibility for correcting or preventing sexual harassment by employees knew about his conduct. Therefore, the court finds no genuine dispute of material fact as to the first element of the affirmative defense; it has been established.

Turning to the second element, Crocco did leave several messages with the secretary of Logue's boss, Sterbank, to complain of sexual harassment.  Crocco never followed through with these messages by actually speaking with Sterbank, because after Logue asked her why she was calling Sterbank she feared that Logue would find out about any complaint she made to Sterbank.  Crocco provides no evidence that her messages to Sterbank actually informed him that she was calling to complain about

sexual harassment.[4]   She provides no evidence that he or anyone in human resources was aware that she had intended to complain about sexual harassment.  Crocco did not contact any advance human resources staff about Logue's harassment and did not call the sexual harassment hotline.  She has testified that this was because she "knew of a woman who had been fired after she called a hotline and revealed she had AIDS."  Crocco Aff. ¶ 143.  "I knew that she had been fired because she had AIDS because Logue told me so."  Id. at ¶ 144.  The court can reasonably infer from the latter statement that this woman had been an Advance employee, but the record contains no evidence that this woman called the sexual harassment hotline to which Advance directed its employees.  The court finds, even drawing all reasonable inferences in Crocco's favor, that Crocco  failed to take advantage of the corrective measure made available to her through the hotline, and that such failure was unreasonable as the Supreme Court used that term in Burlington and Faragher.  See Fierro v. Saks Fifth Avenue, 13 F.Supp.2d 481, 492 (S.D.N.Y. 1998) (holding that "generalized fears" of repercussions and an unpleasant outcome from reporting harassment "can never constitute reasonable grounds for an employee's failure to complain to his or her employer," because "an employer cannot combat harassment of which it is unaware").

     The court therefore finds that, assuming without deciding that Logue did sexually

---

[4] The only evidence of this call appears to be Crocco's statement in her affidavit, "On various occasions including August, 2003, I did call Mr. Sterbank to complain about Logue's sexual harassment and I left messages with his secretary."  ¶ 141; see Plf.'s Mem. Opp. Mots. Summ. J. at 36 [Doc. No. 53-1]; Plf.'s Loc.R. 56(a)2 Statement Re: Advance & Glorioso at ¶ 83 [Doc. No. 59].  It is not reasonable to infer from this language alone that Crocco left any message other than to tell Sterbank that she called or to ask him to call her back.  If Crocco's message was substantive, she should have attested to or otherwise provided evidence of its content.

harass Crocco and created a hostile work environment, Advance is not liable for those actions under Title VII.

### 2.     Direct Discrimination on the Basis of Sex

To the extent that Crocco's complaint may be read to allege that Advance discriminated against her in employment decisions on the basis of sex, such claims must fail because Crocco has proffered no evidence of an "adverse employment action" of the type required for such a claim.  An adverse employment action is a necessary element of the prima facie case that a plaintiff must prove as the first requirement to survive summary judgment under the <u>McDonnell-Douglas</u> burden-shifting analysis.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[5]

> An adverse employment action is a materially adverse change in the terms and conditions of employment . . . . To be " 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." . . . Such a change "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."

<u>Weeks v. New York State (Div. of Parole)</u>, 273 F.3d 76, 85 (2d Cir. 2001), abrogated on other grounds by <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 108-114 (2002) (quoting <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000)).  In the present case, the only action of which Crocco has complained is a threatened demotion.  Prior to her resignation, she suffered no termination, demotion, change in

---

[5]The Second Circuit continues to apply the <u>McDonald Douglas</u>-<u>Burdine</u>-<u>Hicks</u> burden-shifting analysis to Title VII discriminatory treatment claims at the summary judgment stage, <u>see, e.g.</u>, <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005); <u>Feingold v. New York</u>, 366 F.3d 138 (2d Cir. 2004), even though some other courts have declined to apply it following the Supreme Court's decision in <u>Desert Palace, Inc. v. Koster</u>, 539 U.S. 90 (2003).  <u>E.g.</u>, <u>Dare v. Wal-Mart Stores, Inc.</u>, 267 F.Supp.2d 987(D.Minn.2003).

title, material loss of benefits, or significantly diminished material responsibilities. Therefore, the court grants summary judgment on any claim of discrimination on the basis of sex that may have been asserted separately from the hostile work environment and sexual harassment claim.

### 3.   Retaliation

A claim of retaliation for activity protected under Title VII also requires, as part of the prima facie case, evidence of an adverse employment action.  See, e.g., Galdieri/Ambrosini v. Nat'l. Realty & Dev. Corp., 136 F3d 276, 292 (2d Cir. 1998).  As Crocco has failed to present such evidence, the court grants summary judgment to Advance on her retaliation claim.

### B.   Malicious Prosecution

Crocco asserts claims for malicious prosecution against Advance, Logue, and Glorioso.

### 1.   Malicious Prosecution Claims Against Logue and Glorioso

To establish a common law claim of malicious prosecution against a private person, a plaintiff must prove:

> (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff;[6] (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily with a purpose other than that of bringing an offender to justice.

McHale v. W.B.S. Corp., 187 Conn. 444, 447 (1982) (internal citations omitted).

a.   Initiation of Criminal Proceeding.   Logue and Glorioso both argue

---

[6]This element is not disputed.

19

that, as a matter of law, they did not initiate or procure the institution of criminal

proceedings against Crocco.

> A private person can be said to have initiated a criminal proceeding if he
> has insisted that the plaintiff be prosecuted, that is, if he has brought
> pressure of any kind to bear upon the public officer's decision to
> commence the prosecution." [A] private person has not initiated a criminal
> proceeding if he has undertaken no more than to provide potentially
> incriminating information to a public officer.  In such a case, if the
> defendant has made a full and truthful disclosure and has left the decision
> to prosecute entirely in the hands of the public officer, he cannot be held
> liable for malicious prosecution.

Id. at 448 (internal citations omitted).  A defendant is immune from suit for malicious

prosecution if he or she, "in good faith, volunteers false incriminating information."  Id. at

449.

However, "a private person cannot escape liability if he knowingly presents

information that is false."  Id.  Indeed, "[e]ven if the private person did not insist on the

arrest or pressure the officer to make the arrest that person can still be found to have

initiated or procured the prosecution and the first element is satisfied if he or she

knowingly gave information that is false."  Ford v. Barnes, No. CV98-0548082, 2000 WL

33182059, at *3 (July 12, 2000).  The Restatement (Second) of Torts, upon which the

Connecticut Supreme Court relies in stating the elements of malicious prosecution,

McHale, 187 Conn. at 447, explains this rule further:

> A private person who gives to a public official information of another's
> supposed criminal misconduct, of which the official is ignorant, obviously
> causes the institution of such subsequent proceedings as the official may
> begin on his own initiative, but giving the information or even making an
> accusation of criminal misconduct does not constitute a procurement of
> the proceedings initiated by the officer if it is left entirely to his discretion to
> initiate the proceedings or not. When a private person gives to a
> prosecuting officer information that he believes to be true, and the officer
> in the exercise of his uncontrolled discretion initiates criminal proceedings

based upon that information, the informer is not liable under the rule stated in this Section even though the information proves to be false and his belief was one that a reasonable man would not entertain.

The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

If, however, the information is known by the giver to be false, an intelligent exercise of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Restatement (Second) of Torts § 653, cmt. g (1977) (emphasis added); see McHale, 187 Conn. at 449 ("[F]alse information necessarily interferes with the intelligent exercise of official discretion."); Ford, 2000 WL 33182059, at *3 (citing comment g in context of malicious prosecution claim founded upon defendant's 911 call and brief statement to police officer when he arrived at the scene).

Even under Logue's version of the facts, Logue and Glorioso both made materially false statements to Stanton.  In addition to the statements that Stanton recorded in his report, see supra, Part III.B., the evidence that Stanton accused Crocco of having spent the morning stalking Logue and Glorioso with a gun, could reasonably permit an inference that Logue or Glorioso had told Stanton or the police dispatcher that Crocco had a gun.  According to Crocco's affidavit, this fact is false as well.

Although Logue and Glorioso did not specifically request that he arrest Crocco, they did provide information that was likely to lead to her arrest.  The court finds a

21

genuine issue of material fact as to whether Logue and Glorioso knew their statements were false at the time they made them.  In particular, Logue has testified that neither he nor Glorioso ran into the Barnes and Noble to get away from Crocco, Logue Dep. at 67, Logue's Loc.R. 56(a)1 Statement Appx. [Doc. No. 38-4], even though the record contains evidence that both he and Glorioso told Stanton that they had done so when he appeared on the scene, IOR, Logue's Loc.R. 56(a)1 Statement, Ex. J [Doc. No. 38-4].  In light of Crocco's statement that she "was never at or in the vicinity of" the Wolcott Street Advance store on September 5, 2003 and her detailed accounting of her actions that morning, the court also finds a genuine issue of material fact as to whether Logue and Glorioso knew that the statement that she had followed them from the Advance store to the Barnes & Noble store was false.  While they may have truly believed that she followed them even if she had not really done so, the evidence that her truck was nowhere near the Advance store on the morning of September 5 could reasonably permit an inference that they knew that she had not followed them at the time Logue volunteered the contrary statement to Stanton.  They could not have seen her following their car if indeed she was not doing so.  At the very least, the evidence could support an inference that their statement expressed with certainty what was actually only speculation.  In addition, if either Logue or Glorioso did, as Stanton's statement to Crocco may suggest, accuse Crocco of having been following them with a gun, that statement could have been knowingly false for similar reasons.

According to the precedent discussed above, if Logue and Glorioso did know that some of the statements they volunteered were false, they initiated Crocco's prosecution.  The fact that neither Logue nor Glorioso specifically requested that she be

22

arrested, nor made the final decision to arrest her, does not change this result.  See

Cooke v. UAG Fairfield CP, LLC, No. CV040486027S, 2005 WL 2210426, at *2

(Conn.Super. Aug. 18, 2005) (finding genuine issue of material fact as to whether

defendant initiated criminal prosecution where there was evidence that defendant lied in

reporting an alleged theft to the police, even though the defendants argued that "they

did not insist on the plaintiff's arrest and that the arrest came after the police detective

conducted an independent investigation of the matter and applied for an arrest

warrant"); see also Abramowitz v. Burke, No. CV010182923, 2001 WL 1231853, at *2

(Conn. Super. Sept. 26, 2001) (holding that plaintiff's allegation that defendants "falsely

and maliciously complained to [ ] police officers that [the plaintiff] allowed his dog to

bark excessively and that as a result of these false statements, [plaintiff] was

prosecuted" satisfied first element of malicious prosecution standard); Ford, 2000 WL

33182059 (holding that an issue of fact existed as to whether defendant initiated

prosecution by telling 911 operator that there was an "altercation," when the

confrontation that she observed may not have qualified as such, and by pointing out the

plaintiff to a police officer who responded to the call and stating, "there's the problem").

Logue argues that he could not have initiated the prosecution because the

statements he and Glorioso made, even if relied upon, would not legally support the

arrest for breach of the peace in the second degree.  The court need not decide

whether or not the facts of which Logue and Glorioso complained could legally support

a charge of breach of the peace.  The malicious prosecution standard includes no

requirement that the information provided by a defendant actually support the particular

charge on which the plaintiff was prosecuted.  See Zenik v. O'Brien, 137 Conn. 592,

23

596 (1951) (finding sufficient evidence to support conclusion that defendant initiated

prosecution of plaintiff where defendant's verbal accusations of theft caused the police

officer to investigate the plaintiff, but the police officer ultimately charged the plaintiff

with breach of the peace).

The court finds evidence sufficient to create a genuine issue of fact as to

whether Logue and Glorioso made knowingly false statements to Stanton and as to

whether Stanton acted on these statements in exercising his discretion to arrest

Crocco.  Although Stanton testified he based his decision to arrest Crocco based on her

"yelling and screaming" in his presence, "I'm going to get those two guys," Stanton Dep.

34-35, Logue's Loc.R. 56(a)2 Statement Appx. [Doc. No. 38-4], Crocco has testified

that she was not yelling and screaming, and that she made the aforementioned

statement after Stanton had handcuffed her and put her in his police car.  Stanton also

testified that he normally takes a person into custody and places him or her in the back

of his police car after arresting the person, and that he took Crocco into custody "with

handcuffs."  Id. at 41.  Thus, although the evidence does not more precisely establish

the exact moment of the arrest, the court finds a genuine issue of material fact as to

whether it occurred before or after Crocco's potentially threatening statement.  See

Posr v. Doherty, 944 F.2d 91, 99 (2d Cir. 1991) ("The issue of precisely when an arrest

takes place is a question of fact.").  It thus finds a genuine issue of material fact as to

whether this statement was actually a reason for the arrest, and as to whether the

arrest was based on the statements by Logue and Glorioso.

Glorioso and Advance argue that a defendant may not be held to have initiated a

prosecution unless the acts of the defendant were "the determining factor" in the

24

officer's decision to make the arrest.  Even if this were the controlling rule, which the court does not here decide, there is a genuine issue of fact as to whether Glorioso's and Logue's conduct was the determining factor in Stanton's decision.  If Crocco's description of her conduct and statements to Officer Stanton prior to her arrest is truthful, a finder of fact could reasonably infer that Stanton's decision to arrest her must have been motivated solely by the statements by Logue and Glorioso, because Crocco's behavior during the motor vehicle stop would not have reasonably caused Stanton to arrest her.   The fact that Stanton decided to look into the incident because he thought it might involve stalking, as well as Stanton's testimony that Logue's and Glorioso's statement that Crocco had followed them "had something to do with" his decision to perform the motor vehicle stop, permits an inference that at least one of the statements of Logue and Glorioso remained fresh in his mind when he arrested the plaintiff during the very same vehicle stop.  Stanton Dep. 16-17, Logue's Mem. Supp. Mot. Summ. J. Appx. [Doc. No. 38-4].  Viewing this evidence alongside the evidence that Crocco's behavior during the vehicle stop could not have been a motivating factor behind Stanton's decision to arrest her, a finder of fact might reasonably infer that Logue's and Glorioso's statement was "the determining factor" in the arrest.

The record contains sufficient evidence to create an issue of fact as to the first element of malicious prosecution.

### b.    Probable Cause and Malice

Glorioso and Advance further argue that Glorioso acted with probable cause and without malice in making statements about Crocco to Stanton.  "Want of probable cause and malice, combined, are essential" to a malicious prosecution claim.  Mulligan

v. Rioux, 229 Conn. 716, 746, 643 A.2d 1226, 1242 (1994) (internal citation omitted). "If

the evidence supports the former, we need not consider the latter, since it may be

inferred."  Id.

> Probable cause has been defined as the knowledge of facts sufficient to
> justify a reasonable [person] in the belief that he [or she] has reasonable
> grounds for prosecuting an action.  Mere conjecture or suspicion is
> insufficient.  Moreover, belief alone, no matter how sincere it may be, is
> not enough, since it must be based on circumstances which make it
> reasonable.  Although want of probable cause is negative in character, the
> burden is upon the plaintiff to prove affirmatively, by circumstances or
> otherwise, that the defendant had no reasonable ground for instituting the
> criminal proceeding.

Mulligan, 229 Conn. at 739 (internal citations and quotation marks omitted).  "Whether

particular facts constitute probable cause is a question of law."  McMahon v. Florio, 147

Conn. 704, 707 (1960).  Thus, as Glorioso and Advance correctly argue, see Reply to

Plf.'s Opp. to Advance's and Glorioso's Mot. Summ. J. at 3 [Doc. No. 9], the court must

determine whether the evidence supports the assertion that Logue and Glorioso, as

distinct from Officer Stanton, had probable cause to institute a criminal proceeding

against Crocco.

    The court finds genuine issue of material fact as to whether Logue and Glorioso

had probable cause to initiate a prosecution against Crocco.  As discussed above, the

evidence on the record can support a finding that Logue and Glorioso did not believe

the facts they reported to Stanton.  Therefore, Crocco the court does not consider the

facts that Logue and Glorioso reported in determining whether they had probable cause

to initiate a prosecution.  There is evidence on the record, not contradicted or

questioned by any other evidence on the record, that Logue and Glorioso were aware

26

of a recent shooting at Advance headquarters by a terminated employee.  See Logue

Dep. at 56-57, Logue's Loc.R. 56(a)1 Statement Appx. [Doc. No. 38-4]; Glorioso Dep.

at 71, Advance's & Glorioso's Loc.R. 56(a)1 Statement, Ex. B [Doc. No. 44]; Overend

Aff. ¶ 9, Advance's & Glorioso's Loc.R. 56(a)1 Statement, Ex. K [Doc. No. 44].   They

also knew that Crocco had resigned from her job on September 3, or at least that she

had not shown up to work since that date.  They observed her sitting in her truck in the

Barnes and Noble parking lot.  Finally, they knew that she had recently received

increasingly negative performance reviews, that Logue had spoken to her about the

possibility of reassigning her to another position at Advance, and that Crocco, whether

correctly or not, viewed this as a demotion.  See Email from Logue to Crocco, Aug. 29,

2003 (copied to Glorioso), Advance's & Glorioso's Loc.R. 56(a)1 Statement, Ex. J [Doc.

No. 44].  These facts alone could not justify a reasonable person in the belief that he

has reasonable grounds for prosecuting an action.   If the evidence Crocco has

presented as to her activities is accurate, neither her conduct in relation to her

employment at Advance, nor her whereabouts on the morning of September 5 gave

Logue or Glorioso probable cause to initiate a criminal proceeding against her.[7]

    Having determined that Crocco has proffered sufficient evidence to create

genuine issues of material fact as to whether Logue and Glorioso lacked probable

cause, the court need not separately consider the element of malice.  If a finder of fact

---

[7]Advance and Glorioso argue that the plaintiff did not establish a lack of probable
cause because "neither Logue, Glorioso, nor Advance sought the arrest or prosecution"
of Crocco. Advance's & Glorioso's Mem. Supp. Mot. Summ. J. at 33-34 [Doc. No. 42].
This concern is not relevant to the probable cause inquiry, which focuses on the
objective reasonableness of the defendants' actions.  It is, however, addressed in the
discussion of the first element of the malicious prosecution claim.

finds that Crocco has proven that Logue and Glorioso lacked probable cause, that conclusion would permit an inference that Logue and Glorioso acted with malice.  <u>See</u> <u>Mulligan</u>, 229 Conn. at 746.

The court therefore denies Logue's and Glorioso's motions for summary judgment on the malicious prosecution claims against them.

### 2.    Malicious Prosecution Claim Against Advance

Advance does not make any additional arguments for summary judgment on the malicious prosecution claim against it.  Therefore, having reviewed all of the arguments that Advance makes in support of its motion for summary judgment on this claim, the court denies that motion as well insofar as it addresses malicious prosecution.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) (holding that "the burden on the moving party [on a summary judgment motion] may be discharged by "showing"--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case").

### C.    Intentional Infliction of Emotional Distress

Crocco also brings claims against Logue and Glorioso for intentional infliction of emotional distress.  The elements of intentional infliction of emotional distress in Connecticut are well-established.

> It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

<u>Carrol v. Allstate Ins. Co.</u>, 262 Conn. 433, 443 (2003) (quoting <u>Appleton v. Bd. of Edu.</u> <u>of the Town of Stonington</u>, 254 Conn. 205, 253 (2000)).  Logue and Glorioso argue that

28

their conduct was not "extreme and outrageous."

Whether defendants' conduct was sufficiently "extreme and outrageous" is initially a question for the court to decide. Appleton, 254 Conn. at 253 (quoting Bell v. Bd. of Educ., 55 Conn.App. 400, 409-10 (1999)); Whitaker v. Haynes Const. Co., Inc., 167 F. Supp. 2d 251, 254 (D.Conn. 2001).  Only where reasonable minds may disagree on this question does it become an issue for a jury.  Id.

The Connecticut Supreme Court has defined extreme and outrageous conduct as that which "exceeds all bounds usually tolerated by decent society."  Carrol, 815 A.2d at 126 (quoting Petyan v. Ellis, 510 A.2d 1337, 1342 n.5 (Conn. 1986)).

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

Id. (citing Restatement (Second) of Torts § 46, cmt d (1965)).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  Id. (quoting Appleton, 757 A.2d at 1062).  Rather, the conduct must be "of a nature that it is especially calculated to cause, and does cause, mental distress of a very serious kind." Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 194 (D.Conn. 2000); Petyan, 510 A.2d at 1342 n.5 (quoting W. Prosser & W. Keeton, Torts (5th ed. 1984) § 12, p. 60).  This high standard is applied in a fact-specific manner. See Knight v. Southeastern Council On Alcoholism, No. CV 000557182, 2001 Conn. Super. LEXIS 2732, at *11 (Conn. Super. Sep. 24, 2001) (granting motion to strike

29

complaint).

The sole argument that Crocco makes in her memorandum in opposition to summary judgment on the intentional infliction of emotional distress claim, on which issue she cites no case law, is that Logue and Glorioso made a false report to the police in violation of Conn. Gen. Stat. § 53a-180c(a)(1).[8]  The fact, in and of itself, that the record contains evidence that could fulfill the elements of malicious prosecution does not establish a genuine issue of material fact as to whether Logue's and Glorioso's actions were extreme and outrageous.  See King v. Cablevision Sys. of S. Connecticut LP, No. CV 940135727S, 1998 WL 556162, at *6 (Conn.Super. Aug. 24, 1998) (motion for judgment notwithstanding the verdict).  Indeed, a judge of the Connecticut Superior Court has held that, "courts in Connecticut and elsewhere have concluded that calling the police to report suspected wrongdoing normally does not constitute 'extreme and outrageous' conduct sufficient to impose liability for intentional infliction of emotional distress."  Pantaleo v. Ravski, No. CV 920326931, 1997 WL 94103, at *5 (Conn.Super. Feb. 14, 1997) (summary judgment ruling) (citing Clark v. Ferris, 1994 WL 33400 at *5 (Conn.Super. 1994) ("calling police and telephone company regarding harassing phone calls and identifying alleged perpetrator was not 'extreme and outrageous' in the sense required to establish intentional infliction of emotional distress"); Halbert v. City of Sherman, 33 F.3d 526, 529 (5th Cir.1994) ("calling police to report suspected intoxication or drug use is not sufficiently outrageous

_____

[8]Crocco does not provide any legal argument in favor of her intentional infliction of emotional distress claims.  The court considers the merits of these claims only because Crocco discussed the evidence upon which they are based in the context of some of her other claims.

30

to warrant damages for intentional infliction of emotional distress even if those statements are false") (parenthetical descriptions quoted from <u>Pantaleo</u>)); <u>see also</u> <u>Harrison v. McMahon</u>, 3:02CV477(AVC), 2004 WL 1171391, at *7-*8 (D.Conn. May 24, 2004) (summary judgment ruling holding that the conduct of a defendant who requested arrest of the plaintiff for issuing a bad check and signed an affidavit in support of an application for an arrest warrant even though he may have known that the plaintiff's conduct did not satisfy all of the elements of the aforementioned criminal charge was, as a matter of law, insufficient to establish extreme and outrageous conduct). However, the court does not find a bright-line rule that would uniformly prevent any false report to a police officer from constituting extreme and outrageous conduct. <u>See</u> <u>Jezierny v.</u> <u>Brown</u>, No. CV04084755S, 2005 WL 2496525, at *3 (Conn.Super. Aug. 24, 2005) (holding, in denying a motion to strike concerning a defendant who made a false report about the plaintiff to the police and asked them to arrest her, that "to bring the weight of a criminal prosecution on the shoulders of the plaintiff and to use the criminal justice system to achieve a vindictive goal rises to the level of extreme and outrageous conduct by the defendant"). As is the general rule with respect to determining whether conduct was extreme or outrageous, the court will make this determination by considering the specific facts and circumstances of this case. <u>See</u> <u>Jezierny</u>, 2005 WL 2496525, at *3; <u>Knight</u>, 2001 Conn. Super. LEXIS 2732, at *11.

Based upon all the facts in this case, the court finds that reasonable minds could differ on the question of whether Logue's and Glorioso's actions in calling the Waterbury Police Department and knowingly reporting false information to Stanton so as to give the impression that Crocco was stalking or threatening them would constitute

extreme and outrageous conduct.

Glorioso also argues that Crocco does not allege that his actions caused her any emotional distress.  He argues that the arrest caused any emotional distress and that he did not play any role in the plaintiff's arrest.  Based on the reasoning it laid out in the discussion of the malicious prosecution claim, the court finds a genuine issue of fact as to whether Glorioso and Logue in fact played determinative roles in causing the arrest, and therefore rejects his argument that he necessarily did not cause Crocco any emotional distress.

Additionally, Glorioso argues that he was justified in calling the police.  This argument has similarly been addressed in the context of the malicious prosecution claim, and the court finds a genuine issue of material fact as to whether his report to the police was justified.

The court denies the motions for summary judgment on the claim of intentional infliction of emotional distress.

### D.    Negligent Infliction of Emotional Distress

Crocco also brings a claim against Advance for negligent infliction of emotional distress.  The elements of negligent infliction of emotional distress include:

> (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).   Connecticut law does not require extreme and outrageous conduct to establish a claim of negligent infliction of emotional distress.  Adams v. Hartford Courant & Tribune Co.,  No. 3:03CV0477(JCH),

32

2004 WL 1091728, at *6 (D.Conn. May 14, 2004).  It does, however, require a showing that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused might result in illness or bodily harm."  Carrol, 262 Conn. at 446 (internal citation omitted).

In her memorandum in opposition to the motions for summary judgment, Crocco provides virtually no response to Advance's argument on the negligent infliction of emotional distress claim.  She states only, "Advance promoted Glorioso and contested Plaintiff's unemployment benefits."  Neither her memorandum nor her Local Rule 56(a)2 Statement regarding Advance cites any evidence on the record to support the conclusion that a decision by Advance to promote Glorioso would satisfy the legal requirements for a claim of negligent of infliction of emotional distress.  Similarly, neither of these filings cites any evidence on the record to show that Advance contested Crocco's unemployment benefits in a manner that would satisfy the legal standard for negligent infliction of emotional distress.  Therefore, the court grants Advance's motion for summary judgment on the claim of negligent infliction of emotional distress.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.").

### E.      Section 1983

Pursuant to 42 U.S.C. § 1983, Crocco asserts claims for false arrest and unreasonable search and seizure, against Stanton and the City of Waterbury ("City").

### 1.      Claims Against Stanton

33

a.      **False Arrest**

Crocco's primary Section 1983 claim against Stanton alleges unconstitutional

false arrest.  "In analyzing § 1983 claims for unconstitutional false arrest, [the Second

Circuit has] generally looked to the law of the state in which the arrest occurred." Jaegly

v. Couch, --- F.3d ----, 2006 WL 436002, at *2 (2d Cir. Feb. 24, 2006).  Under

Connecticut law, lack of probable cause is an essential element of a false arrest claim.

See Davis v. Rodriguez, 364 F.3d 424, 432 (2d Cir. 2004).[9]

For purposes of the false arrest claim, similarly to the claim of malicious

prosecution, "probable cause is the knowledge of facts sufficient to justify a reasonable

person's belief that there are grounds to make an arrest."  Beinhorn v. Saraceno, 23

Conn.App. 487, 492 (1990).

> Probable cause to arrest depends upon whether, at the moment the arrest
> was made . . . the facts and circumstances within the arresting officers'
> knowledge and of which they had reasonably trustworthy information were
> sufficient to warrant a prudent man in believing that the suspect
> committed or was committing an offense. . . . Probable cause does not
> require the same type of specific evidence of each element of the offense
> as would be needed to support a conviction.  Rather, the court will
> evaluate generally the circumstances at the time of the arrest to decide if
> the officer had probable cause for his action:
>
> In dealing with probable cause, . . . as the very name implies, we deal with
> probabilities.  These are not technical; they are the factual and practical
> considerations of everyday life on which reasonable and prudent men, not
> legal technicians, act.

Adams v. Williams, 407 U.S. 143, 148-49 (1972) (internal citations, quotation marks,

---

[9]The Second Circuit has not definitively resolved the question of who bears the
ultimate burden of persuasion with respect to probable cause in Section 1983 false
arrest cases.  Davis, 364 F.3d at 433 n.8.  For the present purposes, this issue is not
material.

and parentheses omitted).  "In evaluating these matters, we consider the facts available to the officer at the time of the arrest."  <u>Ricciuti v. N.Y.C. Trans. Auth.</u>, 124 F.3d 123, 128 (2d Cir. 1997).

"A police officer may rely on the complaint of a third party to establish probable cause."  <u>Craig v. Krzeminski</u>, 764 F.Supp. 248, 250 (D.Conn. 1991).  "[I]t is well established that a law enforcement officer has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.  Furthermore, [t]he veracity of citizen [complainants] who are the victims of the very crime they report to the police is assumed."  <u>Stone v. Town of Westport</u>, No. 3:04cv18 (JBA), 2006 WL 118379, at *7 (D.Conn. Jan. 13, 2006) (quoting <u>Miloslavsky v. AES Engineeering Soc., Inc.</u>, 808 F.Supp. 351, 355 (S.D.N.Y. 1992)).

"Where a false arrest plaintiff has been charged with a crime for which [s]he was arrested, [s]he must produce evidence directly rebutting that charge in order to carry h[er] burden of production." <u>Davis</u>, 364 F.3d at 434-35.

The evidence on the record does create genuine issues of fact as to whether or not Stanton had been informed, prior to the arrest, of some of the information that he lists in his memorandum in support of his motion for summary judgment as giving him probable cause to perform the arrest.  In particular, issues of fact remain as to whether he was informed of Logue's and Glorioso's roles in criticizing Crocco's performance, that Crocco had quit her job, that she had made disparaging remarks to Overend regarding Logue and Glorioso, that Crocco was aware Logue and Glorioso frequented the Barnes & Noble coffee shop, that Crocco had been staring at Logue and Glorioso,

that Crocco may have had a gun with her, that a former Advance employee had recently shot a supervisor, and that Overend had urged Logue and Glorioso to immediately contact the police.[10]  Similarly, genuine issues of fact remain as to whether Crocco made the statement that she was "going to get" Logue and Glorioso before or after the arrest, whether Crocco was swinging or waving her arms while speaking to Stanton, and whether she ever raised her voice in responding to Stanton's questions and accusations.  Viewing the evidence in a manner in favor of Crocco[11] and taking into account Crocco's admissions, a finder of fact would nevertheless have to conclude that Stanton had been informed of the following facts at the time he made the arrest:

(1)     that Logue, Glorioso, and Crocco were employees of Advance, Stanton Dep. at 16, 28, City's & Stanton's Loc.R. 56(a)1 Statement, Ex. G [Doc. No. 37-4]; see Plf.'s Loc.R. 56(a)2 Statement Re:  City and Stanton at ¶ 16 [Doc. No. 56];

(2)     that Crocco had followed Logue's and Glorioso's vehicle from the Advance store to the Barnes & Noble store, Plf.'s Loc.R. 56(a)2 Statement Re: Logue at ¶ 44;

(3)     that Logue believed Crocco had not come to work for the past two days because she was going to be investigated for stealing,[12] id.;

---

[10]Stanton argues in his memorandum that he had probable cause to arrest Crocco as a result of these facts.  However, he does not state these specific facts in his Local Rule 56(a)1 statement of undisputed material facts.  Therefore, the court may not rely on these facts even if the plaintiff has not provided specific evidence that Stanton lacked knowledge of them.

[11]In drawing all reasonable inferences in favor of Crocco for purposes of the claims against Stanton, the court reaches some factual conclusions different from those it reached when drawing all inferences in favor of Crocco for purposes of the claims against Logue and Glorioso.  For purposes of the claims against Stanton, it assumes that Logue and Glorioso gave Stanton the least amount of incriminating information that might reasonably be found on the basis of the present record.

[12]Even though Stanton has testified that he did not take the allegations of stealing into account in making the arrest, the court considers them here insofar as they

> (4)    that Logue and Glorioso were afraid of what Crocco might do and so ran into the Barnes & Noble to get away from her, id.;

It is also undisputed that Stanton saw Crocco in her truck in the Barnes & Noble parking lot, that Crocco was driving out of the parking lot as Stanton began his attempt to get her to pull over, and that she did not stop her car immediately when he deployed his lights and siren.  She did stop driving after he pulled his police car behind her vehicle.  it is undisputed that Crocco told Stanton, prior to her arrest, that he was crazy and that Logue and Glorioso were lying.  Plf.'s Loc.R. 56(a)2 Statement Re: City and Stanton at ¶ 19.

Conn. Gen. Stat. § 53a-181(a) defines breach in the peace in the second degree as follows:

> A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, "public place" means any area that is used or held out for use by the public whether owned or operated by public or private interests.

The court finds evidence on the record that Stanton clearly lacked probable cause to arrest Crocco under most of the subsections of this statute. A closer question exists as

_____

could have informed his view of Crocco's state of mind.  The probable cause inquiry is an objective analysis.  See Bradway v. Gonzales, 26 F.3d 313, 319 (2d Cir. 1994) ("In evaluating the legitimacy of police conduct under the Fourth Amendment, we look to objective circumstances rather than an officer's subjective motivation.")

to whether Crocco proffered sufficient evidence to show that Stanton lacked probable cause to arrest her for engaging in "threatening behavior in a public place." Conn.Gen.Stat. § 53a-181(a)(1).  Nevertheless, drawing all reasonable inferences in Crocco's favor, a finder of fact could conclude that Stanton lacked probable cause for an arrest under subsection (a)(1).  The information that the court has found proper to consider as having been available to Stanton at the time he made the arrest would not necessarily warrant a prudent person in believing that Crocco was engaging in threatening behavior in a public place.  Probable cause would require some additional information to suggest that Crocco was actually behaving in a threatening manner.  A report that she had a gun would probably have given Stanton probable cause, as would any remarks she made before her arrest that could be construed as threatening.  But the court cannot rely on either of these facts at the summary judgment stage.  See supra, p. 35-37.  It therefore finds a genuine issue of material fact as to whether Stanton's arrest of Crocco violated her rights under the Fourth Amendment to the United States Constitution.

However, it must also consider whether Stanton, as a police officer, is shielded by qualified immunity for his conduct in arresting Crocco.  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)).  "When confronted with a claim of qualified immunity, a court must ask first the following question: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" Id.

38

(quoting Saucier, 533 U.S. at 201); see Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  If the court finds that the officer's conduct violated a constitutional right, it must then ask whether the right was "clearly established" at the time the violation occurred.  Caldarola, 298 F.3d at 160.  "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Brosseau, 543 U.S. at 198 (quoting Saucier, 533 U.S. at 206).  "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Caldarola, 298 F.3d at 160 (internal citations and quotation marks omitted).  The inquiry is, in essence, a determination whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (internal citations and quotation marks omitted).  The Second Circuit has described the second prong of the qualified immunity inquiry in the context of a false arrest claim as a question of whether the officer had "arguable probable cause," as opposed to the stricter standard of actual probable cause.  Id. at 162.

Beginning with the first prong of the qualified immunity analysis, the court has already found a violation of Crocco's constitutional right.   With respect to the second prong, however, it finds that Stanton had "arguable probable cause" to arrest Crocco. Although there is some evidence on the record that could show that he lacked actual probable cause, the question of actual probable cause is close enough that it would not be clear to a reasonable officer that Stanton's conduct in arresting Crocco was unlawful in the situation he confronted.  The report that Crocco followed Logue and Glorioso, the observation that she was seated in her truck in the parking lot, the report that she was being investigated for stealing from Advance, and the report that Logue and Glorioso

39

were afraid of her, viewed collectively, might cause a reasonable officer to doubt that an arrest for breach of the peace would be unlawful.  The court therefore finds that Stanton is protected by qualified immunity.  It grants summary judgment to Stanton on the Section 1983 claim premised on false arrest.[13]

### b.    Search of Vehicle

Crocco also alleges in her complaint that Stanton violated her Fourth Amendment rights by searching her truck.  The court agrees with Stanton that he did not violate Crocco's constitutional rights by performing the vehicle search, because he performed it incident to a legal custodial arrest.  Although warrantless searches are presumptively unreasonable, searches of the passenger compartment of a motor vehicle are permitted when incident to a lawful arrest, even if the arrestee, like Crocco, had been removed from the vehicle, handcuffed, and placed in a police car prior to the search.  See Thornton v. United States, 541 U.S. 615 (2004) (affirming search of vehicle even though arrestee had exited vehicle prior to police stop and had been arrested, handcuffed, and placed in the backseat of the patrol car prior to vehicle search); Wayne R. LaFave, 3 Search and Seizure § 7.1(c) (2004) (citing New York v. Belton, 453 U.S. 454, 469 (1981) (Brennan, J., dissenting) (" Under the approach taken today, the result would presumably be the same even if Officer Nicot had handcuffed Belton and his companions in the patrol car before placing them under arrest, and even

---

[13]The court notes that, on page 46 of her memorandum, Crocco quotes from a Connecticut Superior Court case discussing the legal standard for a section 1983 claim premised on an allegedly unlawful Terry stop.  See Terry v. Ohio, 392 U.S. 1 (1968).  However, she does not explain how this caselaw should be applied to any of the facts of her case and does not otherwise allege an unlawful Terry stop.  The court therefore does not consider any section 1983 claim based upon such a stop.

if his search had extended to locked luggage or other inaccessible containers located in the back seat of the car.") and United States v. Wesley, 293 F.3d 541 (D.C.Cir. 2002) (holding that, under Belton, police "may search the passenger compartment of the vehicle without regard to whether the occupant was removed and secured at the time of the search"), among other cases).  Crocco provides no evidence suggesting that Stanton's search of the truck extended beyond its passenger compartment.  The search itself therefore does not constitute a violation of Crocco's Fourth Amendment rights.

Even if it did, however, the court would still find that Stanton has qualified immunity with respect to this search, because the right to be free from a vehicle search in these circumstances is not clearly established such that a reasonable officer would have known that Stanton's search was unlawful.  The court grants summary judgment to Stanton on the claim that he unreasonably searched the vehicle.

### c.     Seizure of Documents

After searching Crocco's truck, Stanton seized office some papers from the front seat area of the truck and gave them directly to Logue, without including this action in his incident offense report.  Although the parties dispute whether Crocco acted lawfully in carrying the Advance documents in her truck, Crocco provides no evidence to suggest that Stanton took any documents that were not Advance property.  Stanton argues that the fact that several papers did not belong to Crocco establishes that Crocco's Fourth Amendment rights were not violated.

In response, Crocco states in a footnote that (1) under Connecticut's penal code, even a person "who has obtained possession of property by theft or other illegal means shall be deemed to have a right of possession superior to that of a person who takes,

41

obtains, or withholds it from him by larcenous means," Conn. Gen. Stat. § 53a-118(b),
and (2) Crocco's possession of the documents was lawful.  However, the court finds, for
the reasons discussed below, that the actual legality of Crocco's possession of the
papers and Stanton's conduct after removing the papers from the truck are not material
to the Fourth Amendment inquiry.

"[A]n object that comes into [plain] view during a search incident to arrest that is
appropriately limited in scope under existing law may be seized without a warrant."
Horton v. California, 496 U.S. 128, 135 (1990); see, e.g., Bradway v. Gonzales, 26 F.3d
313, 319 (2d Cir. 1994).  "[N]ot only must the item be in plain view; its incriminating
character must also be "immediately apparent."  Id. at 136.[14]  The police officer must
have "probable cause to suspect that the item is connected with criminal activity."
United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994).  Although the police would
violate a plaintiff's Fourth Amendment rights if they could not identify an item as the

---

[14]The Horton Court also stated a second requirement:  that the officer "have a
lawful right of access to the object itself."  Horton, 496 U.S. at 137.  It noted that this
requirement

> is simply a corollary of the familiar principle . . . that no amount of
> probable cause can justify a warrantless search or seizure absent 'exigent
> circumstances.' Incontrovertible testimony of the senses that an
> incriminating object is on premises belonging to a criminal suspect may
> establish the fullest possible measure of probable cause.  But even where
> the object is contraband, this Court has repeatedly stated and enforced
> the basic rule that the police may not enter and make a warrantless
> seizure.

Id. at 137 n. 7 (internal citations omitted).  With respect to searches of motor vehicles,
in contrast to homes, however, the courts have not required true exigent circumstances
to gain access to the vehicle.  See LaFave, 3 Search and Seizure § 7.5(a) (internal
citations omitted).

allegedly stolen property without first manipulating it, "[i]t is not a prerequisite for a legal seizure under the plain view doctrine that at the time of the search the officers know with certainty that the seized item is evidence of a crime." Bradway, 26 F.3d at 319. Crocco has proffered no evidence suggesting that the papers in her car were hidden from view or that they were not immediately identifiable as documents belonging to Advance.  In light of the Logue's statement that Crocco was being investigated for stealing from Advance, Stanton reasonably identified these papers as stolen property and seized them.  Moreover, even if a jury could find that it was unreasonable for him to believe that he had probable cause to seize the documents, the court would find that Stanton has qualified immunity with respect to this seizure, because there is no clearly established right against seizure of property under these circumstances.  The court grants summary judgment insofar as the Section 1983 claim is premised on seizure of the papers.

### d.      Seizure of Advance Store Key

Crocco's complaint also may be read to allege an unreasonable seizure of the Advance store key that was in her truck at the time of her arrest.  Based on the information provided by Crocco, the key was in plain view, on the same key ring as the key to her truck.   In light of the Logue's statement that Crocco was being investigated for stealing from Advance and Crocco's statement that the Advance store key was on her key ring in her truck, Stanton had probable cause to seize the key and reasonably could have identified the key by sight, such that its incriminating character was immediately apparent.  Crocco has proffered no evidence suggesting that the key was actually hidden from view or was not immediately identifiable as the store key.

43

Moreover, even if Stanton had not had actual probable cause to seize the key, the court would find that he had arguable probable cause, sufficient to invoke the protection of qualified immunity.  The court grants summary judgment to Stanton as to any claim premised on the unlawful seizure of the Advance store key.

### e.    Stanton's Failure to Return Seized Property

The record does contain evidence that Stanton did not inventory the seized papers or key and did not return these items to Crocco, but rather handed them immediately to Logue based on Logue's assertion that they belonged to Advance. Although Stanton's conduct in this regard was potentially illegal,[15] Crocco brings to the court's attention no cases suggesting that it could violate Crocco's rights under the Fourth Amendment in particular.[16]  The court therefore grants summary judgment to Stanton on any claims of failure to properly handle or return the seized papers or key.

### f.    Seizure of Truck

To the extent that Crocco asserts any claim in Count IV for unconstitutional seizure of her truck itself, see Compl. ¶¶ 43, 80-82, 89, Stanton has not mentioned this claim in his memoranda in support of his motion for summary judgment.  He has not carried his burden of "showing – that is pointing out to the district court –  an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315

---

[15] For example, the Second Circuit has recognized a viable Fourteenth Amendment due process claim based on failure to return seized property to an arrestee.  Alexandre v. Cortes, 140 F.3d 406 (2d Cir. 1998); see also Overstreet v. Myers, 75 F.Supp.2d 858 (N.D.Ill. 1999) (denying summary judgment to police officer who had failed to return seized property to arrestee).

[16] Crocco has not plead a section 1983 violation premised on the violation of any other constitutional right.

F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations
omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d
Cir. 1995); see Part II, supra.  The court therefore treats his motion for summary
judgment as a motion for partial summary judgment and does not grant summary
judgment on any Section 1983 claim premised on unreasonable seizure of the truck.
Defendant Stanton is given leave to file a motion for summary judgment on this claim, if
filed no later than April 10, 2006.  No extensions will be granted.

### 2.      Failure to Train Claims Against the City

The Section 1983 claims that Crocco asserts against the city are premised on
the city's failure to adequately train its police officers.  "[F]or liability to attach [on a
theory of failure to train], the identified deficiency in a city's training program must be
closely related to the ultimate injury."  City of Canton v. Harris, 489 U.S. 378, 391
(1989).  To prevail on such a claim, a plaintiff must "prove that the deficiency in training
actually caused the police officers'" violation of the plaintiff's constitutional rights.  Id.
(discussing a Monell failure-to-train claim founded on deliberate indifference to medical
needs); see Amnesty America v. Town of West Hartford, 361 F.3d 113, 129 (2d Cir.
2004) (citing City of Canton).  She must show that the injury would have been "avoided
had the employee been trained under a program that was not deficient in the identified
respect."  Id.  The Second Circuit recently refused to reinstate a Monell claim on which
a defendant had won summary judgment, solely because it found no violation of the
plaintiff's constitutional rights by defendant police officers.  Zirlin v. Village of Scarsdale,
No. 05-2067,  2005 WL 3557552, at *2 (Dec. 28, 2005) (discussing section 1983 claim
founded on alleged fourth amendment violation).  Similarly, the Ninth Circuit has held

45

that "[a] § 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights." <u>Orin v. Barclay</u>, 272 F.3d 1207, 1217 (2001) (affirming summary judgment for city on section 1983 claim based upon police officer's alleged violation of First Amendment rights).

Crocco has not argued any basis for the City's liability other than its failure to train Stanton.  Thus, in light of its ruling granting in part Stanton's motion for summary judgment, the court also grants partial summary judgment to the City, insofar as allegations against it are premised on Stanton's arrest of the plaintiff, search of the truck, or seizure of documents from her truck.  With respect to any claim against the City premised on Stanton's seizure of Crocco's truck itself, the City is given leave to file a motion for summary judgment on this claim, if filed no later than April 10, 2006.  No extensions will be granted.

## V.    CONCLUSION

For the foregoing reasons, the court rules as follows:

The motion for summary judgment by the City and Stanton [**Doc. No. 37**] is GRANTED in part and DENIED in part.  The court denies this motion as to any Section 1983 claim against Stanton alleging that his seizure of Crocco's truck itself violated her Fourth Amendment rights and as to any claim that the City's failure to train Stanton caused the unlawful seizure of the truck.  It grants this motion as to the remainder of the claims in Counts IV and V.

The motion for summary judgment by Logue [**Doc. No. 38**] is DENIED.

The motion for summary judgment by Advance and Glorioso [**Doc. No. 41**] is GRANTED in part and DENIED in part.  The court grants this motion as to Counts I, II,

46

and VII.  It denies this motion as to Counts III and VI.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of March, 2006.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge